UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHAYLENE MONTOYA, | * | CIV 09-4156-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING DEFENDANTS' |
| CITY OF FLANDREAU, | * | MOTION FOR SUMMARY |
| KEN JAMES, JUSTIN HOOPER, | * | JUDGMENT |
| and SCOTT GAALSWYK, | * | |
| | * | |
| Defendants. | * | |

## I. INTRODUCTION

Plaintiff Shaylene Montoya has sued Defendants City of Flandreau, Ken James, Justin

Hooper, and Scott Gaalswyk (collectively "Defendants") under 42 U.S.C. §§ 1983, 1985, and

1988. Montoya alleges for her Section 1983 claim that Flandreau Police Officer Justin Hooper

used excessive force against Montoya, and that the City of Flandreau and its then Chief of Police

Ken James failed to properly train or supervise Officer Hooper and his colleague Officer Scott

Gaalswyk. For her Section 1985 claim, Montoya alleges that Officers Hooper and Gaalswyk

conspired to deprive her of constitutional rights by attempting to justify Officer Hooper's use of

force, that the conspiracy was on account of Montoya being Native American, and that the City

of Flandreau and Chief James passively participated in the conspiracy. Montoya's claims arise

out of an incident on November 8, 2006, when Officer Hooper performed a "leg sweep" while

arresting Montoya that fractured Montoya's left leg. For the reasons explained below, this Court

grants Defendants' Motion for Summary Judgment.

## II. FACTS NOT SUBJECT TO DISPUTE

Shaylene Montoya and Robert Cournoyer lived together in Flandreau, South Dakota for about four years. (Doc. 36, Plaintiff's Response[1] at ¶ 42). Sometime before November 8, 2006, that relationship had soured, resulting in Montoya moving to Utah. Id.

On November 8, 2006, Montoya returned to Flandreau, South Dakota, intending to retrieve the remainder of her belongings from Cournoyer's home. At 3:11 p.m. on November 8, 2006, Cournoyer called the Flandreau Police Department after a domestic disturbance developed between Cournoyer and Montoya. Id. at ¶ 38. Officers Hooper and Gaalswyk responded to the call at 3:17 p.m. Id. at ¶ 39. Montoya admits that during this first visit of the police officers she was "loud and clearly upset." Id. at ¶ 44. The police officers learned that Montoya was moving her belongings out of the home. Cournoyer told the officers that he wanted Montoya moved out of the residence before Cournoyer had to leave for work at 4:00 p.m. Id. at ¶ 43. Officers Hooper and Gaalswyk talked Montoya and Cournoyer into being respectful toward one another, and Montoya appeared to calm down. Id. at ¶ 45. The officers stayed at the Cournoyer residence for about 15 minutes while Montoya removed the majority of her belongings, at which point the officers left. Id. at ¶ 46. Montoya recalls that the officers told her that if they had to come back again, she or someone would be arrested. Id. at ¶ 47.

Later that afternoon, Cournoyer again called the Flandreau Police Department. Officers Hooper and Gaalswyk again responded, arriving at approximately 4:28 p.m. Id. at ¶ 48. At this

---

[1]This Opinion and Order takes the facts from Document 36, which is Plaintiff's Response to Defendants' Statement of Undisputed Material Facts. That document contains two sections - the Response to Defendants' Statement of Undisputed Material Facts numbered 1 through 81, and Plaintiff's Statement of Disputed Facts numbered 1 through 19. The Court will refer to the two parts of Document 36 as "Plaintiff's Statement" and "Plaintiff's Response" followed by the paragraph number.

point, Montoya admittedly was "upset and crying" because Cournoyer had threatened to take their son to the Yankton Sioux Tribe Reservation and she was concerned about her ability to contact him there. Id. at ¶ 49. When the officers arrived, Montoya and Cournoyer were outside the residence arguing with one another. Id. at ¶ 50. Upon learning of the subject matter of the dispute, Officer Gaalswyk told Montoya and Cournoyer that it would be illegal for Cournoyer to take their son to the reservation to prevent contact with Montoya and that doing so would fall under the FBI's jurisdiction. Id. at ¶ 51. While looking at Cournoyer, Montoya, as she put it, "raised her open hands above her head." Id. at ¶ 53. At that point, Montoya and Cournoyer were "having words." (Doc. 36, Plaintiff's Statement at ¶ 4).

Taking the facts in the light most favorable to Montoya, Montoya raised her hands above her head out of frustration at a time when she was perhaps 10 to 15 feet away from Cournoyer. Id. at ¶¶ 5-6, 10. Montoya was not intending to hit Cournoyer, and Cournoyer was not in fear that he was about to be hit. Id. at ¶ 9. One of the officers, probably Officer Hooper, said "that's enough." Id. at ¶ 8. Officer Hooper then grabbed and handcuffed Montoya's left wrist. (Doc. 36, Plaintiff's Response at ¶ 57; Plaintiff's Statement at ¶¶ 8, 10). Montoya reacted, apparently by drawing her right arm away and toward her stomach, and Montoya heard someone say either "quit resisting" or "stop resisting." (Doc. 36, Plaintiff's Statement at ¶¶ 11-12; Plaintiff's Response at ¶ 60).

Officer Hooper then swiped a leg in a kicking motion into Montoya's left leg and pushed her forward toward the ground. (Doc. 36, Plaintiff's Statement, at ¶¶ 8, 11).[2] Officer Hooper

---

[2]Officers Hooper and Gaalswyk claim that Montoya pulled her right hand away to prevent that hand from being handcuffed. (Doc. 36, Plaintiff's Response at ¶ 58.) Officer Hooper told Montoya to stop resisting, but she continued to struggle. Id. at ¶ 59. According to the Defendant,

referred in testimony to this maneuver as a "leg sweep." (Doc. 36, Plaintiff's Statement at ¶ 14). The leg sweep resulted in Montoya sustaining a broken left leg. Id. at ¶ 13. Montoya was arrested for simple assault, disorderly conduct, and resisting arrest. Id. at ¶ 15. The officers, following the arrest, observed that Montoya was hobbling, asked if she needed an ambulance, assisted her into the police car, and drove her to the Flandreau Hospital. (Doc. 36, Plaintiff's Response at ¶¶ 67-69).

As all counsel agreed at the hearing, a state court judge conducted a preliminary hearing on the charges and found probable cause to bind over all three charges for trial. After a court trial, a judge found Montoya guilty of disorderly conduct, but not guilty of the remaining charges of simple assault and resisting arrest. (Doc. 36, Plaintiff's Statement at ¶ 15).

Montoya claims that the Defendants violated her Equal Protection Clause rights because she is Native American and because Defendants were inadequately trained, so some additional facts are necessary. Montoya is Native American. So too are Chief James, Officer Hooper, and Robert Cournoyer. (Doc. 36, Plaintiff's Response at ¶¶ 19, 21). The Flandreau Santee Sioux Tribe has its headquarters and trust land in and around the city of Flandreau. Around December of 2000, the City of Flandreau and the Flandreau Santee Sioux Tribe entered into a joint powers agreement for law enforcement services, under which the Flandreau Police Department agreed to provide law enforcement services for both the City and the Tribe. Id. at ¶¶ 2-3. The joint powers agreement created a public safety commission to establish, administer, and supervise the Flandreau Police Department. Id. at ¶ 5. The Flandreau Police Department maintains records

---

when Montoya continued to resist, Officer Hooper placed his right leg in front of her left leg and pushed her forward to the ground. Id. at ¶ 61.

regarding citizen complaints. Id. at ¶ 7. Montoya has pointed to no complaints from before the time of her arrest for this Court to consider in support of her Equal Protection Clause claim. See id. at ¶¶ 35-36.

The Flandreau Police Department requires its officers to meet the qualification and training requirements established by the South Dakota Attorney General's office and set forth in the South Dakota Administrative Rules. Id. at ¶ 8. Flandreau Police Department officers also are required to attend the Bureau of Indian Affairs Criminal Jurisdiction in Indian Country training program, pursuant to the contract with the Tribe. Id. The Flandreau Police Department requires all officers to attend the 12-week South Dakota Law Enforcement Training Academy in Pierre and to meet the State's continuing education requirements. Id. at ¶ 9. The South Dakota Law Enforcement Training Academy addresses, among other things, domestic violence training that teaches how to identify the aggressor in a domestic situation, the application of force continuum that explains the appropriate level of force to apply and when to apply it, and pressure point control tactics. Id. at ¶ 10. The leg sweep performed by Officer Hooper is not a pressure point control tactic. The Use of Force policy of the Flandreau Police Department states that "officers shall use only the force that is reasonably necessary to overcome resistance from a person being taken into custody, to stop an assault of a third person, in self-defense, or as reasonably necessary to perform their police functions." (Doc. 36, Plaintiff's Statement at ¶ 17). The Use of Force policy also provides that "officers shall not use unnecessary force or violence in making an arrest or in dealing with a prisoner or any person." Id.

The Flandreau Police Department has a field training and evaluation program for new officers that generally lasts six weeks, but may exceed six weeks for various reasons. (Doc. 36,

Plaintiff's Response at ¶ 12). The City of Flandreau's employee handbook provides for a six-month training period for new employees to assess the individual's ability to perform their assigned duties. Id. at ¶ 13.

Officer Hooper began working for the Flandreau Police Department in August of 2006. Id. at ¶ 22. Officer Hooper had attended the South Dakota Law Enforcement Training Academy in May of 2005 and became a certified law enforcement officer. Id. at ¶ 23. Officer Hooper completed other various training courses and the continuing education requirements mandated by the State of South Dakota. Id. at ¶ 24. Officer Hooper also completed the Bureau of Indian Affairs Criminal Jurisdiction in Indian Country training program in May of 2007. Id. at ¶ 25. The only discipline taken against Officer Hooper during his employment with the Flandreau Police Department was a written reprimand for using chewing tobacco in the office sometime between September of 2006 and September of 2007. Id. at ¶ 26. Officer Hooper left the Flandreau Police Department in April of 2010 to work as a special agent criminal investigator for the Bureau of Indian Affairs, where he is currently employed. Id. at ¶ 27.

Officer Gaalswyk has a degree in criminal justice from Iowa Lakes Community College and began working for the Flandreau Police Department in November of 2001. Id. at ¶ 28. Officer Gaalswyk attended the South Dakota Law Enforcement Training Academy in January of 2002 and became a certified law enforcement officer. Id. at ¶ 29. Officer Gaalswyk has completed other various training courses and the continuing education requirements as mandated by the State. Id. at ¶ 30. Officer Gaalswyk also completed the Bureau of Indian Affairs Criminal Jurisdiction and Indian Country training program in July of 2004. Id. at ¶ 31. Officer Gaalswyk was promoted to sergeant in February of 2003. Id. at ¶ 32. The only discipline taken against

-6-

Officer Gaalswyk during his employment with the Flandreau Police Department was a written reprimand for smoking in his patrol car in December of 2003, and a one-day suspension after a second offense in November of 2004. Id. at ¶ 33. Officer Gaalswyk left the Flandreau Police Department in March of 2008 to work as a patrol deputy and training officer for the Lincoln County Sheriff's Office, where he continues to work today. Id. at ¶ 34.

Chief James never received any complaints regarding Officer Hooper or Officer Gaalswyk for allegedly using excessive force while employed at the Flandreau Police Department before the November 8, 2006 incident. Id. at ¶ 35. None of the citizen complaints on file reveal any complaints alleging that either officer used excessive force during this period. Id. at ¶ 36. During her deposition, Montoya acknowledged that she did not have any documentation to verify her failure-to-train claims. Id. at ¶ 76. Montoya based her allegation of insufficient training on information from her mother, who believed that the officers did not have proper training. Id. at ¶ 78. Montoya also identified two instances, both after November 8, 2006, where a different officer of the Flandreau Police Department allegedly used excessive force in arresting a Native American. Id. at ¶¶ 79-81.

Chief James was not present when Officer Hooper and Officer Gaalswyk encountered Montoya and Cournoyer. Neither officer consulted with Chief James about the incident. Id. at ¶ 72; (Doc. 36, Plaintiff's Statement at ¶ 18). Chief James did not investigate the incident, and, according to Montoya's allegations, failed to investigate other unidentified incidents involving use of excessive force by his officers against Native Americans. Id. at ¶¶ 18-19. Chief James left the Flandreau Police Department in October of 2009 and currently is employed by the Bureau

of Indian Affairs as chief of police for the Standing Rock Reservation in North Dakota. (Doc.

36, Plaintiff's Response at ¶¶ 17-18).

## III. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper

when "the movant shows that there is no genuine dispute as to any material fact and the moving

party is entitled to a judgment as a matter of law." "Summary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal

Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination

of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Rule 1 of the

Federal Rules of Civil Procedure). In a determination of whether summary judgment is

warranted, the evidence is "viewed in the light most favorable to the nonmoving party." True

v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin.,

Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). "If opposing parties tell two different stories, the

court must review the record, determine which facts are material and genuinely disputed, and

then view those facts in a light most favorable to the non-moving party, as long as those facts are

not so blatantly contradicted by the record that no reasonable jury could believe them." Id.

(internal quotations omitted). A party opposing a properly made and supported motion for

summary judgment must cite to particular materials in the record supporting the assertion that

a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1). "To survive summary judgment, a plaintiff

must substantiate his allegations with enough probative evidence to support a finding in his

favor." Adam v. Stonebridge Life Ins. Co., 612 F.3d 967, 971 (8th Cir. 2010) (quoting Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008)).

## B. Section 1983 Claims

### 1. Excessive force claim against Officer Hooper

The Fourteenth Amendment to the United States Constitution protects against a governmental official like Officer Hooper depriving a person like Montoya of life, liberty, or property without due process of law. Section 1983 provides for a cause of action in federal court for a violation of the Fourteenth Amendment. The Fourteenth Amendment serves to apply portions of the Bill of Rights, including the Fourth Amendment, to state and local officials.

Montoya alleges that Officer Hooper contravened her Fourth Amendment rights and her liberty rights by using excessive force against her. In determining whether excessive force was used, "[t]he dispositive question is whether the amount of force the officer used was objectively reasonable." Shannon v. Koehler, 616 F.3d 855, 862 (8th Cir. 2010). "In turn, the reasonableness of a particular use of force depends on the circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (internal citations omitted); see also Samuelson v. City of New Ulm, 455 F.3d. 871, 875 (8th Cir. 2006) ("Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.") (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). The

inquiry is an objective one, "without regard to [the officer's] underlying intent or motivation."

Samuelson, 455 F.3d at 875-76 (quoting Graham, 490 U.S. at 397).

> The Supreme Court has stated:

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . With respect to a claim of excessive force, the standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

Schulz v. Long, 44 F.3d 643, 648 (8th Cir. 1995) (quoting Graham, 490 U.S. at 396-97). "The

Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in

general." Id. "The Fourth Amendment inquiry focuses not on what the most prudent course of

action may have been or whether there were other alternatives available, but instead whether the

seizure actually effectuated falls within a range of conduct which is objectively 'reasonable' under

the Fourth Amendment." Id. at 649.

As a matter of law, the force used by Officer Hooper, "judged from the perspective of a

reasonable officer on the scene," was not unreasonable. Officers Hooper and Gaalswyk had

twice responded to calls for police assistance from Cournoyer on November 8, 2006, regarding

a domestic disturbance involving Montoya. During the first visit, Montoya admitted that she was

"loud and clearly upset." The officers stayed for fifteen minutes while Montoya removed the

majority of her items from Cournoyer's residence. The officers told Montoya that if they had to

return, she or someone would be arrested. When the officers responded a second time, Montoya

admittedly was "upset and crying." Montoya and Cournoyer were arguing outside, and Montoya

raised her hands above her head. An officer responded by saying "that's enough." Officer Hooper began to handcuff Montoya, and Montoya reacted by moving her right arm away. Montoya recalls then being told to quit or stop resisting. Officer Hooper then performed the leg sweep on Montoya. Very unfortunately, and contrary to the intention of Officer Hooper, the leg sweep broke Montoya's leg. This Court cannot view the circumstance with "the 20/20 vision of hindsight," Schulz, 44 F.3d at 648, and must be mindful that "not every push or shove, even if may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. Graham, 490 U.S. at 396-97. Montoya was found to be guilty beyond a reasonable doubt of disturbing the peace, though she was found not guilty of resisting arrest and assault. At the time Officer Hooper began the arrest, Montoya was in violation of a law restricting disorderly conduct. Montoya's gesture of the hands raised above the head may have been in frustration and apparently was at a distance where she would have had to take some steps in order to strike at Cournoyer. However, a rapidly evolving domestic dispute was ongoing and the conduct of Montoya had resulted in Cournoyer making two separate calls to the police. When Officer Hooper began handcuffing Montoya, she moved her right arm away. She was told to stop or quit resisting before Officer Hooper performed the leg sweep. The fact that Montoya's leg was broken is unfortunate but was unintended. Examining the conduct of Officer Hooper under the circumstances, this Court finds that the action of Officer Hooper in performing the leg sweep was not a violation of the Fourth Amendment or Fourteenth Amendment of the United States Constitution.

**2. Other Section 1983 Claims**

-11-

Because Montoya does not have a viable claim that Officer Hooper used excessive force violative of her Fourth Amendment rights, there is no underlying constitutional violation for which the City, Chief James, or Officer Gaalswyk could be liable. Of course, a requirement of any Section 1983 claim is a showing that a right secured by the Constitution or federal law was violated. Cole v. Bone, 993 F.2d 1328, 1334 (8th Cir. 1993); see also Schulz, 44 F.3d at 650 (where plaintiff failed to show that excessive force was used against him, summary judgment for the defendants on the failure-to-train claim was proper). As a result, the City, Chief James, and Officer Gaalswyk are entitled to summary judgment on the Section 1983 claim as well.

Even if this Court were to have found that Officer Hooper violated the constitutional rights of Montoya, Montoya's Section 1983 claim against the remaining Defendants still would fail. Montoya admits that Officer Gaalswyk made no physical contact with her while Officer Hooper was performing the leg sweep. (Doc. 36, Plaintiff's Response at ¶¶ 60-62). Montoya alleges that Officer Gaalswyk conspired with Officer Hooper, but makes this allegation as part of her Section 1983 claim. (Doc. 1 at ¶ 29).

Montoya's claim against the City likewise fails, even if Officer Hooper used excessive force in violation of the Fourth Amendment. "Under 42 U.S.C. § 1983, a municipality may not be held vicariously liable for the unconstitutional acts of employees." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). Rather, the standard for liability for failure to train is "deliberate indifference" to the rights of persons with whom the police come into contact. Otey v. Marshall, 121 F.3d 1150, 1156 (8th Cir. 1997) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)). For the City to be liable for a failure to train, Montoya must show that 1) the officer training program was

-12-

inadequate; 2) the City was deliberately indifferent in adopting the training program; and 3) the alleged deficiency in the City's training program caused Montoya's injury. See Harris, 489 U.S. at 390-91; Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996).

As detailed above, Officers Hooper and Gaalswyk were certified law enforcement officers. Both had undergone training, consistent with the Flandreau Police Department's training policies, including completing the South Dakota Law Enforcement Training Academy program and the Bureau of Indian Affairs Criminal Jurisdiction and Indian Country training program. The Eighth Circuit has recognized that "attendance at a training academy and on-the-job training is sufficient for proper training." Tucker v. Evans, 276 F.3d 999, 1003 (8th Cir. 2002); see also Andrews, 98 F.3d at 1076-77 (training program consisting of attendance at a police academy and two weeks on-the-job training is sufficient for proper training); Williams-El v. Johnson, 872 F.2d 224, 230 (8th Cir. 1989) (finding police academy and on-the-job training adequate for correctional officers with no prior experience). The Flandreau Police Department's training policy and the actual training undertaken by Officers Hooper and Gaalswyk were adequate. Both officers fulfilled their state, city, and departmental training and continuing education requirements throughout their employment with the Flandreau Police Department.

Moreover, there is no evidence that the City acted with "deliberate indifference." For the City to have acted with deliberate indifference, it must have had notice that the training program was somehow deficient and likely to cause constitutional violations. See Thelma D. v. Bd. of Educ. of City of St. Louis, 934 F.2d 929, 934 (8th Cir. 1991). Notice of such a deficiency can be established: 1) where the need to train is so obvious that failure to do so could be characterized as "deliberate indifference" to constitutional rights; or 2) where the need for

-13-

additional training may not be obvious at the outset, but a pattern of constitutional violations could put the municipality on notice that its employees' responses to regularly recurring situations are insufficient to protect the constitutional rights of its citizens. Id. at 934-35; see also Plamp v. Mitchell Sch. Dist. No. 17-2, No. 07-4009, 2008 U.S. Dist. LEXIS 43972, at *27 (D.S.D. 2008).

The City did not have notice of any deficiency in its training programs that were likely to cause constitutional violations. Neither Officer Hooper nor Officer Gaalswyk had been subject to discipline or complaint for using excessive force. Regarding the allegation of a pattern of constitutional violations, Montoya in her Complaint only alleged generally other incidences of excessive force, and in discovery only identified two allegations of excessive force, both of which were committed by a different officer and after the November 8, 2006 incident in this case.

Finally, there is no evidence that any alleged deficiency in the City's training program caused Montoya's injury. See Harris, 489 U.S. at 390-91. Montoya urges that pressure point control would have been sufficient to complete her arrest. However, it is not sufficient to prove that an injury could have been avoided if an officer had more or better training sufficient to allow him to avoid the particular injury-causing conduct. Harris, 489 U.S. at 391. In fact, Officer Hooper, as a part of the basic training requirements, had learned about pressure point control tactics. Officer Hooper's choice, under the fast-moving circumstances of the arrest, was to use a leg sweep rather than pressure point control tactics. That choice does not create a genuine issue of material fact as to the sufficiency of the training.

Likewise, even if Montoya had a valid claim for violation of the Fourth Amendment against Officer Hooper, Montoya as a matter of law cannot have a claim against Chief James in his supervisory capacity for failing to train or supervise Officer Hooper. A supervisor, similar to a municipality, is not liable under Section 1983 merely because a subordinate violated someone's constitutional rights. See Harris, 489 U.S. at 385. A supervisor is liable for a subordinate's constitutional violation only if he directly participated in the constitutional violation or if his failure to train or supervise the offending actor caused the deprivation. Brockinton v. City of Sherwood, 503 F.3d. 667, 673 (8th Cir. 2007); Otey, 121 F.3d at 1155.

For the reasons expressed above, there is no evidence that Chief James failed to adequately train his officers. Officers Hooper and Gaalswyk were adequately trained. Likewise, for the reasons discussed above, there is no genuine dispute of material fact or evidence supporting the allegation that Chief James failed to adequately supervise the officers or had notice of complaints about the officers or the Flandreau Police Department that would suggest a need for additional training or supervision.

## C. Montoya's Section 1985 Conspiracy Claim

Invoking 42 U.S.C. § 1985, Montoya claims that Officers Hooper and Gaalswyk conspired to make Officer Hooper's alleged excessive force appear legitimate, that their conspiracy was based on Montoya's status as a Native American, and that the City and Chief James condoned or ratified this conspiracy by allowing a pattern of excessive force against Native Americans. Montoya is a Native American, as is Cournoyer, the other party to the domestic dispute. Officer Hooper, who performed the "leg sweep," and Chief James, who was his supervisor at the time, both are Native Americans.

Section 1985 creates a private right of action against persons who conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To proceed with such a claim, Montoya must show: 1) a conspiracy between the Defendants; 2) that the purpose of the conspiracy was to deprive her either directly or indirectly of her civil rights; 3) that the Defendants acted in furtherance of the conspiracy; and 4) that the Defendants' actions caused her injury or harm or deprived her of having or exercising a right or privilege of an American citizen. See Andrews, 98 F.3d at 1079. Further, the alleged conspiracy must be fueled by "class-based, invidiously discriminatory animus." Id. (quoting Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268 (1993)). Montoya must "demonstrate a discriminatory purpose in that the defendants selected the particular course of action 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." Andrews, 98 F.3d at 1079-80 (citing Bray, 506 U.S. at 272).

Montoya's Section 1985 claim fails as a matter of law. There is no evidence of a conspiracy between Officers Hooper and Gaalswyk to violate her rights, and "[a] conspiracy claim requires evidence of specific facts that show a meeting of minds among conspirators." Barstad v. Murray Cnty., 420 F.3d 880, 887 (8th Cir. 2005) (internal quotation omitted). Montoya must show an agreement between conspirators by "pointing to at least some facts which would suggest that [the defendants] reached an understanding to violate her rights." Bogren v. Minnesota, 236 F.3d 399, 409 (8th Cir. 2000) (quoting Larson by Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996)). Montoya appears to claim a tacit "meeting of the minds" or an "understanding to violate her rights" because she was arrested and charged with simple assault,

-16-

resisting arrest, and disorderly conduct. There is no evidence that the officers conferred with one another and agreed to violate Montoya's rights. Indeed, the process of arresting Montoya was started before the leg sweep occurred. Moreover, a judge at a preliminary hearing found probable cause sufficient to bind over for trial all charges against Montoya. Montoya ultimately was found guilty of disorderly conduct and not guilty of the two other charges. Because Montoya has not offered any evidence to support her conspiracy claim, the Defendants are entitled to summary judgment. See Adams v. Boy Scouts of America-Chickasaw Council, 271 F.3d 769, 778 (8th Cir. 2001) (where the evidence merely showed that the officers responded to calls for assistance in removing an allegedly trespassing and disruptive individual, there was no evidence for a fact finder to infer that the officers acted based upon plaintiff's African-American race); Andrews, 98 F.3d at 1079-80 (summary judgment proper where there was no evidence of an agreement between defendants to violate plaintiff's rights and no evidence of a discriminatory animus toward women).

## D.  Whether Montoya's Claims are Barred by the Doctrine of Qualified Immunity

"Qualified immunity protects governmental officers from liability for civil damages when they are performing discretionary functions and their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Brockinton, 503 F.3d at 671 (8th Cir. 2007) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "This immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Id. at 672 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

-17-

"[T]o withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must:

> 1) assert a violation of a constitutional right; 2) demonstrate that the alleged right is clearly established; and 3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated plaintiff's clearly established right."

Id. (quoting Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996)).

Officers Hooper and Gaalswyk and Chief James are entitled to qualified immunity on Montoya's Section 1983 claims. Because Officer Hooper's conduct was constitutionally reasonable as a matter of law, Montoya has failed to assert a constitutional violation against him. See McGruder v. Heagwood, 197 F.3d 918 (8th Cir. 1999) (officer granted qualified immunity where the use of potentially deadly force was not an objectively unreasonable response to the situation). Without a valid underlying constitutional violation against Officer Hooper, Montoya's claim against Chief James and Officer Gaalswyk also fail on qualified immunity grounds.

**E.  Section 1988 Claims**

Montoya makes claims under 42 U.S.C. § 1988 for costs, disbursements, and attorney's fees. These claims hinge on whether she has and can prevail on a claim under Sections 1983 and 1985. Because summary judgment for the Defendants is appropriate on the Section 1983 and Section 1985 claims, Montoya has no independent claim under Section 1988.

**IV.  CONCLUSION AND ORDER**

For the reasons contained herein, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. 25) is granted.

Dated March 15, 2011.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE